Jane L. RUPLEY, Appellant,

v.

Robert Lee RUPLEY, III, Appellee.

No. 88–CA–860–MR.

Court of Appeals of Kentucky.

Aug. 18, 1989.

Discretionary Review Denied
by Supreme Court
Oct. 11, 1989.

Stuart N. Pearlman, Louisville, for appellant.

H. Wesley Shanks, Louisville, for appellee.

Before ELSWICK, EMBERTON and HAYES, JJ.

ELSWICK, Judge:

The central issue in this divorce action is whether the domestic relations commissioner, and subsequently the circuit court, erred in ruling that a property settlement agreement between the parties was not unconscionable.

Determination of the issue depends primarily upon the value of, and the marital contribution to, a private corporation owned by the husband. There is also contention with regard to marital interest in the parties' home.

To the extent relevant here, the property settlement agreement provides that the husband, Lee Rupley, is to pay $100 per week child support and, for three years, $95 per week maintenance. The residence is to be conveyed to Lee, who will assume and pay the mortgage; Jane Rupley and the children will occupy the home for three years, after which time they are to vacate and receive $2,220, "which represents her marital share of the home." Jane releases any claim to the corporation (Midwestern), and will receive $5,000 (deferred for three years at zero interest).

This agreement was prepared by Lee's attorney, and was signed by Jane on Janu-

ary 7, 1987, before she retained counsel. Evidently she was advised to see an attorney if she wanted; she was also advised that Midwestern was virtually worthless.

In his original recommendations, on March 27, 1987, the domestic relations commissioner found that the evidence regarding the values of the real estate and the corporation was insufficient to determine whether the agreement was unconscionable. On July 20, the trial court referred the matter back to the commissioner for evidentiary hearings.

The evidence reveals that the Rupleys were married in 1974. They now have two minor children. At the beginning of the marriage, Lee owned 40% of a corporation engaged in providing burglar- and fire-alarm services for homes and businesses. By 1976 his interest had dropped to 25%. In that year, the corporation split into two separate entities, and Lee Rupley and one Charles Leonard each became 50% holders of the company which is now Midwestern. Jane, once an employee, became a director and corporate secretary from 1977 to 1984.

In March 1984, Lee agreed to buy Leonard's half of the stock for $219,000, with $100,000 down and four annual installments of $29,750 plus interest. Apparently both Rupleys signed a note to Leonard for $119,000. The purchase agreement recites that the buyer and seller are informed parties conducting an arm's-length transaction. The shares were to be endorsed to Lee.

To finance the purchase, Lee and Jane, individually and as officers of Midwestern, borrowed $140,000 from the Cumberland Federal Savings and Loan, on April 27, 1984. This note was payable over ten years, with interest adjusted annually to the prime rate; for the first year, payments were $2,173.73 per month. Collateral included all inventory, accounts, and funds of the corporation; in addition, the Rupleys executed a $140,000 mortgage on their home. From the loan, some $19,000 was applied to retire an existing home mortgage, and $100,000 was paid to Leonard.

The corporate books as of June 30, 1984, treat the $140,000 debt as a corporate liability, but only the $19,000 used to pay off the prior mortgage as a receivable, an advance to the stockholder. The purchased stock, supposedly bought by Lee individually, is accounted as treasury stock. To add oddity to oddity in this curiously mixed corporate/personal transaction, the remaining obligation to Leonard ($119,000) does not appear as a corporate liability until the following fiscal year, at which time the balancing entry is made to the treasury stock account. For reasons which will, we trust, become apparent, we find it significant that the asset accounts do not reflect that the Rupleys are obligated to the corporation for the $219,000 being paid for Leonard's stock. The company's excess book liabilities over book assets, which totalled about $5,900 on June 30, 1983 (before the subject stock transaction), grew to over $81,600 by June 30, 1984 (at which time the $140,000 loan, less the $19,000 receivable, is a factor), and burgeoned to almost $225,000 by June 30, 1985 (with the entry of the $119,000 still payable to Leonard); by June 30, 1986, the deficit had decreased to about $176,600. Retained earnings totalled approximately $9,100 at FYE 1983, $33,400 at FYE 1984, $9,100 at FYE 1985, and $54,250 at FYE 1986. Net income reported was approximately $5,200 FYE 1983, $24,250 FYE 1984, − $24,250 (loss) FYE 1985, and $45,100 FYE 1986.

Other significant facts are that the corporation's contract accounts generate an average revenue of $33,500 per month; that the books show no value for goodwill; that Lee's reported salary was increased from about $22,000 in 1986 to $35,000 in 1987; and that Lee has offered to sell the company for two million dollars.

A certified public accountant retained by Jane testified that the books are inaccurate and do not represent the true value of the corporation, which he estimated to be $465,000. The corporation's CPA, defending the books, maintained that the company has "no net asset value"; he alluded to the company's income, rate of return, and deficit position. The commissioner found that the "only reliable evidence ... shows that

the corporation has ... 'no net asset value.' " He further found that Mrs. Rupley "had full knowledge of the business, having been an officer and director during the marriage."

With respect to the real estate, there was contention as to the amount paid for the property, its market value at the time of purchase, and the marital contribution. On Lee's testimony and Jane's (recanted) affidavit, the commissioner found that the price paid for one-half interest (Lee had inherited one-half) was $39,000, and that the market value of the entire property at the time was therefore $78,000. The marital contribution was put at $3,732.02, comprising the marital value of the proceeds of the sale of the previous residence, plus a marital mortgage reduction of $1,003. The commissioner found the total equity in the property to be $114,816, deducting from present appraised value $4,185 in taxes due and a "mortgage balance due [of] $18,-999...." Applying the formula endorsed by this court in *Brandenburg v. Brandenburg,* Ky.App., 617 S.W.2d 871 (1981), the commissioner computed the non-marital value to be 93.7% of the equity, or $107,-582.60, and the marital value to be 6.3% of the equity, or $7,233.40.

Upon all these findings rest the commissioner's conclusions, in his report filed December 2, 1987, that Jane had failed to show fraud, coercion, or overreaching, and, further, that the separation agreement is not unconscionable. Exceptions to this report were overruled by the court by its opinion and order entered on February 19, 1988, finding no abuse of discretion. A supplemental decree was entered the same day, confirming the commissioner's report and effectuating the agreement.

Bringing appeal, Jane contends: 1) that the commissioner and the court erred in evaluating the corporation solely on its "book value"; 2) that the commissioner erroneously declined to hear evidence of fraud, coercion, undue influence, etc.; 3) that the *Brandenburg* formula should not be applied to realty encumbered by a commercial loan, and that the findings of an $18,999 mortgage and a $39,000 purchase price were abuses of discretion; and 4) that the appellant was denied a fair opportunity for discovery, reasonable notice of hearing, and a fair trial.

■ Appellant contends, and we agree, and appellee does not dispute, that market value, investment and earning value, and net asset value are all legitimate considerations in the general case when evaluating a corporation or its stock. The weight to be accorded each element depends on the circumstances of the individual case. Cf. *Ford v. Courier–Journal Job Printing Co.,* Ky.App., 639 S.W.2d 553 (1982). In the present case, the principal element relied upon by the commissioner and the court was net asset value as shown on the corporate books. In the circumstances of this case, particularly considering the nature of the 1984 stock transaction and its curious treatment in the corporate accounting, we believe that this element is a wholly unreliable basis for evaluation, and moreover that the results of an earnings-and-investment approach, and perhaps even market value, may be similarly misleading for the same reason.

We, alas, are not accountants. However it seems rather elementary that if the corporation financed Mr. Rupley's purchase, as an individual, of Leonard's stock, then the books ought somewhere to state, as an asset, $219,000 receivable from Rupley, or at least to show an annual dividend or a supplementary salary in excess of $55,000 for payments made by the corporation on his behalf.

If on the other hand the stock was purchased either directly or indirectly by the corporation as treasury stock, as maintained by the company's accountant, then the transaction was in violation of KRS 271A.030, under which the purchase would have had to be made from available earned surplus, or at least from available capital surplus, whereas at the time the corporate books showed no surplus, but rather a deficit. In that event the Rupleys, as the directors responsible for the expenditure, are liable to the corporation for the entire consideration paid. KRS 271A.240(1)(b). This receivable is nowhere treated in the

accounting. Little wonder then that the books display a large net liability and a modest average net income.

The book value is furthermore deceptive in reflecting no value for goodwill, whereas the company's contracts provide an average recurrent monthly revenue of $33,500. Moreover, an arm's-length transaction between a willing buyer and a willing seller put the company's market value at $438,-000 in 1984, at which time the books showed no net asset value.

Under these circumstances, we believe it was clear error to decide the issue of corporate worth based essentially upon the net asset value appearing on the books. Apparently the actual value of this corporation can be ascertained only by an independent, informed appraisal. If it should be determined that the company does have real value, and further that there is substantial marital interest in this value, and considering among other factors the wife's continuing personal liability on the stock-purchase notes, it may become evident that the property settlement agreement is indeed unconscionable. KRS 403.180; KRS 403.190. We are mindful of the sound principles stated in *Peterson v. Peterson*, Ky. App., 583 S.W.2d 707 (1979), that a party challenging an agreement has a relatively high burden of proof, and that we generally will not disturb a trial court's finding on that issue unless there is some evidence of fraud, undue influence, or overreaching. We are satisfied that the representation made to Jane, that the company was worthless, upon which representation she might well have relied to her detriment (not having been a director or officer since 1984) constitutes "some evidence" of overreaching, something perhaps beyond a bad bargain, sufficiently within the purview of *Peterson*. We further point out that we have not concluded that the subject agreement is in fact unconscionable; we hold only that a new determination must be made, based upon a more credible value assessment.

■ As for the realty, we are not convinced by the appellant's argument that the *Brandenburg* approach is inapplicable to the case. The formula provides a useful, though not exclusive, tool in the pursuit of a just and equitable solution. Of course its application here is complicated by the facts that both the real estate and the corporation are mortgaged on the same loan, and that the corporation, in which there is a marital interest, is paying the debt.

The finding of a $39,000 purchase price for the one-half interest is warranted by the evidence, considering Mrs. Rupley's affidavit acknowledging that price. The finding of an $18,999 mortgage due and a total equity of $114,816, is clearly not supported by the record, however. The home was mortgaged for $140,000 in 1984; this amount was reduced by $22,833.74 as of January 27, 1987, with the corporation continuing to make monthly payments, which may well be found upon remand to constitute marital contribution. The teasing out of these threads, however complex and exasperating an enterprise, must be undertaken in order to achieve a just result. It is only upon a sure grasp of such details that a decision as to the unconscionability of the property settlement agreement may be rendered with confidence.

Regarding the remaining issues, we find sufficient indication in the record that the commissioner did hear and consider relevant evidence as to fraud, duress, coercion, and the like, and that his findings are not error, with the single exception that "full knowledge" of the corporation's status as of January 7, 1987, ought not to have been imputed to Mrs. Rupley based solely upon her having been an officer and a director in 1984. In any event, we are not of the opinion that a finding of any of the aforementioned elements is an absolutely necessary prerequisite to a finding of unconscionability under KRS 403.180.

Considering the duration of the hearings, the volumes of testimony and exhibits in evidence, and the solicitous attention demonstrated by the court and commissioner in the interest of a fair and correct outcome in this daunting cause, we find no merit in the allegations that the appellant was denied discovery, notice, or a fair trial.

Upon remand, the issue of unconscionability must be resolved by taking into account, among other factors which may be deemed material: 1) the actual value of the corporation; 2) the marital interest in the corporation; and 3) the effect of the corporate value and the marital interest therein upon the marital contribution to the equity in the real estate.

The opinion/order and the supplemental decree of the Jefferson Circuit Court entered on February 19, 1988, are reversed, and the matter is remanded for further proceedings consistent with this opinion.

All concur.